# IN THE SUPREME COURT OF IOWA

No. 07–1764

Filed January 22, 2010

**LORI A. GREGORY,**

Appellant,

vs.

**SECOND INJURY FUND OF IOWA,**

Appellee.

Appeal from the Iowa District Court for Polk County, Carla T. Schemmel, Judge.

Employee appeals from the district court's judgment affirming the workers' compensation commissioner's denial of her claim against the Second Injury Fund. **DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED.**

Corey J. L. Walker of Walker & Billingsley, Newton, for appellant.

Thomas J. Miller, Attorney General, and Greg Knoploh, Assistant Attorney General, Des Moines, for appellee.

**HECHT, Justice.**

In this appeal, we must decide whether the workers' compensation commissioner erred in concluding a claimant who sustained successive injuries in the course of her employment is not entitled to benefits from the Second Injury Fund (the Fund). The commissioner concluded the Fund owes nothing in this case under Iowa Code section 85.64 (2001) because the first injury sustained by the claimant, Lori Gregory (Gregory), resulted in surgeries and functional losses to both of her arms and shoulders and functional limitations extending into the whole body. On appeal from the district court's judgment affirming the commissioner's decision, we reverse and remand for further proceedings consistent with this opinion.

## I. Background Facts and Proceedings.

Gregory began working for Jeld-Wen, Inc. d/b/a Doorcraft of Iowa (Doorcraft) in 1999. In September 2000, she experienced bilateral upper extremity dysfunction. She underwent a right carpal tunnel surgery on December 15, 2000, and had the same surgery on the left side on February 19, 2001. These procedures left Gregory with a two percent functional impairment of her left hand and a six percent functional impairment of her right hand.

In the spring and summer of 2001, Gregory underwent bilateral surgical procedures intended to decompress her distal clavicles and treat pain in her shoulders. The orthopedist who performed these procedures subsequently opined Gregory sustained a ten percent impairment of her right arm and a ten percent impairment of her left arm secondary to the surgical treatment of her clavicles.

Gregory was able to continue her employment at Doorcraft after her recovery from the surgeries. However, she sustained a new injury in

the course of her employment on October 8, 2002, when a door end-rail fell, fracturing her right foot. During the ensuing months, Gregory was treated for persistent pain in the injured foot and in her right leg.

Gregory filed a petition with the Iowa Workers' Compensation Commissioner on July 6, 2004, seeking compensation from Doorcraft for the injury to her right foot.[1] The petition also asserted Gregory was entitled to benefits from the Fund, alleging the 2000 injury to her left hand constituted a first qualifying injury and the 2002 injury to her right foot constituted a second qualifying injury.[2] The industrial commissioner denied Gregory's claim against the Fund, concluding the 2000 injury did not constitute a first qualifying injury under Iowa Code section 85.64 because the resulting functional limitations "clearly extend[ed] beyond the bilateral arms and into the whole body." The commissioner reasoned that the 2000 injury could not constitute a first qualifying injury because it resulted in permanent partial bilateral disability to Gregory's hands, arms, and shoulders for which compensation was calculated as an injury to the body as a whole under Iowa Code section 85.34(2)($u$).

Gregory sought judicial review, and the district court affirmed the commissioner's decision.

---

[1]Although the fracture was situated in the right foot, Gregory's petition initially alleged an injury to the body as a whole because a treating physician had diagnosed symptoms of reflex sympathetic dystrophy (RSD) in the right leg. The RSD symptoms resolved, however, and Gregory subsequently abandoned her claim that the 2002 injury extended permanently beyond the right foot, a scheduled member under Iowa Code section 85.34(2)($n$).

[2]Gregory's workers' compensation claim against Doorcraft for the 2000 bilateral hand and shoulder disabilities was resolved by a special case settlement agreement under Iowa Code section 85.35 on July 19, 2004.

## II. Scope of Review.

An appeal of a workers' compensation decision is reviewed under standards described in chapter 17A. Iowa Code § 86.26. "The agency decision itself is reviewed under the standards set forth in section 17A.19(10)." *Mosher v. Dep't of Inspections & Appeals*, 671 N.W.2d 501, 508 (Iowa 2003). The agency's decision in this case was based on an interpretation of Iowa Code section 85.64. Interpretation of the workers' compensation statute is an enterprise that has not been clearly vested by a provision of law in the discretion of the commissioner. *Finch v. Schneider Specialized Carriers, Inc.*, 700 N.W.2d 328, 330 (Iowa 2005). Thus, we will reverse the agency's decision if it is based on "an erroneous interpretation" of the law. Iowa Code § 17A.19(10)(*c*).

## III. Discussion.

Gregory contends the commissioner erred in concluding her 2000 left-hand injury cannot qualify as a first injury under section 85.64. The Fund asserts the commissioner correctly concluded Gregory's 2000 injury resulting in impairment to more than one member enumerated in the statute, considered for purposes of workers' compensation together with impairment to Gregory's shoulders in determining disability to her body as a whole, cannot qualify as a first injury under the statute. A brief review of the Fund's legislative history will aid our resolution of this issue.

The General Assembly passed legislation establishing the Fund in 1945. The statute originally provided in relevant part:

> If an employee who has previously lost, or lost the use of, one hand, one arm, one foot, one leg, or one eye, becomes permanently and totally disabled by a compensable injury which has resulted in the loss of or loss of use of another such member or organ, the employer shall be liable only for the degree of disability which would have resulted from the

latter injury if there had been no preexisting disability. In addition to such compensation, and after the expiration of the full period provided by law for the payments thereof by the employer, the employee shall be paid out of the "Second Injury Fund" created by this Act the remainder of such compensation as would be payable for permanent total disability after first deducting from such remainder the compensable value of the previously lost member or organ.

1945 Iowa Acts ch. 81, § 2. The scope of the statute was extended less than a decade later when the General Assembly amended the law and eliminated the requirement that the claimant prove total permanent disability as a result of the second injury to establish the Fund's liability. 1951 Iowa Acts ch. 59, § 6 (expressing in its title the intent "to liberalize the provisions of the second injury fund"). Under the current version of section 85.64, the Fund is implicated in a workers' compensation claim when an employee suffers successive qualifying injuries.

We have noted the Fund was conceived by the legislature to encourage the employment of disabled persons "by making the current employer responsible only for the disability the current employer causes." *Second Injury Fund v. Shank,* 516 N.W.2d 808, 812 (Iowa 1994); *see also Second Injury Fund v. Neelans,* 436 N.W.2d 355, 358 (Iowa 1989) (noting the purpose of second injury fund statutes "was to provide a more favorable climate for the employment of persons injured through service in World War II"); *Anderson v. Second Injury Fund,* 262 N.W.2d 789, 791–92 (Iowa 1978) (stating the purpose of second injury fund statutes is to encourage employers to hire disabled workers).[3] The Fund's salutary

---

[3]It has been suggested that this court's decisions have mischaracterized the General Assembly's primary purpose in adopting the Fund and that the primary purpose of second injury fund statutes is mitigation of the harsh consequences of the apportionment rule for employees and the full-responsibility rule for employers in certain cases involving successive injuries to body parts enumerated in section 85.64. Although mitigation of the harsh consequences of the full-responsibility rule might have motivated legislatures in other states as they adopted their second injury fund statutes, such motivation was not likely a substantial factor in Iowa. *See* Lee M. Jackwig, *The Second Injury Fund of Iowa: How Complex Can a Simple Concept Become?* 28 Drake L.

purpose is accomplished by an award of compensation after a second qualifying injury to "an employee who has previously lost, or lost the use of, one hand, one arm, one foot, one leg, or one eye." Iowa Code § 85.64. Thus, Gregory's entitlement to benefits from the Fund is dependent upon proof of the following propositions: (1) she sustained a permanent disability to a hand, arm, foot, leg, or eye (a first qualifying injury); (2) she subsequently sustained a permanent disability to another such member through a work-related injury (a second qualifying injury); and (3) the permanent disability resulting from the first and second injuries exceeds the compensable value of "the previously lost member." *Id.*; *Shank,* 516 N.W.2d at 812.

Each party believes the plain language of section 85.64 supports its position. The Fund reads the statute to mean a first qualifying loss must be confined to a body part enumerated in the statute. As Gregory's disability arising from the 2000 injury included not only a partial functional loss of her left hand but also included disabling injuries to both of her shoulders resulting in compensation for industrial disability, the State contends the commissioner correctly concluded the Fund has no liability in this case. Gregory views section 85.64 more broadly. She posits the statute must be interpreted to include within the universe of

---

Rev. 889, 890–91 (1978–1979) (noting that under Iowa law antedating the adoption of Iowa's Fund, "employers in Iowa had already been assured that if they hired a one-eyed, one-armed, or one-legged individual they would be liable only for any actual loss of the other eye or limb in a subsequent work-related injury because liability for total disability depended upon loss of two such organs or limbs in the same accident," and suggesting the General Assembly's purpose in establishing the Fund was providing disabled persons with "a means of reasonably sufficient recovery in the event [they sustain] a subsequent compensable injury that combines with a prior disability so as to result in a degree of disability that exceeds the sum of the compensable values of the prior and subsequent disabilities"). Although a further exegesis as to which conception of the General Assembly's purpose merits the designation of "primary" could be of academic interest, we believe it would be of little significance to the appropriate disposition of this case. To be sure, "the general purpose of encouraging employers to hire [disabled persons] is not defeated [by the Fund]." *Id.* at 891.

qualifying first losses any disability to an enumerated body part whether or not it coexists with one or more disabilities simultaneously sustained in other enumerated or unenumerated body parts. We find each of these interpretations to be plausible, rendering the statute ambiguous.

When interpreting a statute, our "ultimate goal is to determine and effectuate the intent of the legislature." *Beier Glass Co. v. Brundige*, 329 N.W.2d 280, 283 (Iowa 1983). We generally presume words contained in a statute are used in their ordinary and usual sense with the meaning commonly attributed to them. *Am. Home Prods. Corp. v. Iowa State Bd. of Tax Review*, 302 N.W.2d 140, 142–43 (Iowa 1981). In discerning the meaning of an ambiguous statute, we construe terms according to their accepted usage when they are not defined in the statute. *State v. Bower*, 725 N.W.2d 435, 442 (Iowa 2006). We strive for "an interpretation that is reasonable, best achieves the statute's purpose, and avoids absurd results." *Id.*

We also give careful attention to the purpose of a statute as we engage in interpretation. *Am. Home Prods.*, 302 N.W.2d at 143. Workers' compensation statutes are to be liberally construed in favor of the employee. *Myers v. F.C.A. Servs., Inc.*, 592 N.W.2d 354, 356 (Iowa 1999).

> The legislature enacted the workers' compensation statute primarily for the benefit of the worker and the worker's dependents. Therefore, we apply the statute broadly and liberally in keeping with the humanitarian objective of the statute. We will not defeat the statute's beneficent purpose by reading something into it that is not there, or by a narrow and strained construction.

*Holstein Elec. v. Breyfogle*, 756 N.W.2d 812, 815–16 (Iowa 2008) (citations omitted).

With these principles in mind, we must interpret section 85.64 to determine whether Gregory "lost, or lost the use of, one hand, one arm,

one foot, one leg, or one eye" as a consequence of the 2000 injury. Although not controlling here, our recent decision in *Second Injury Fund v. George*, 737 N.W.2d 141 (Iowa 2007), is instructive. In *George*, the claimant sustained a work-related injury in 1996 resulting in a seven percent disability to her left leg. 737 N.W.2d at 144. In 2000, George sustained another work-related injury that caused disability to both of her legs. *Id.* The Fund contended George's 2000 right leg injury was not a qualifying second injury because her left leg was also injured in the same incident. *Id.* at 145. Affirming the commissioner's determination that the bilateral nature of the 2000 injury did not preclude its qualification as a second injury under section 85.64, we interpreted the phrase "loss of or loss of use of another such member" to mean a subsequent loss to another enumerated member notwithstanding more than one enumerated member was disabled as a consequence of the same incident. *Id.* at 147.

Although *George* interpreted only that part of section 85.64 which addresses the second qualifying injury, we believe its reasoning is relevant here. Liability of the Fund under section 85.64 expressly turns on the *part(s) of the body* permanently injured in successive injuries. The focus of our analysis must therefore be on whether Gregory sustained a partial permanent loss of at least two enumerated members in successive injuries. She clearly did. Given our decision in *George* that a subsequent injury to an enumerated member is not disqualified as a second injury merely because it occurred simultaneously with an injury to another enumerated member, we believe it would be senselessly inconsistent to conclude a first qualifying injury cannot likewise occur simultaneously with an injury to another such member.

Our determination that Gregory's 2000 left hand injury qualifies as a first injury under section 85.64 is not affected by the fact that the incident also caused bilateral shoulder impairment and was therefore compensated as an unscheduled injury under Iowa Code section 85.34(2)(*u*). The plain language of section 85.64 does not support the Fund's contention that it is significant to the determination of whether the 2000 injury is a first qualifying loss that *compensation* was calculated under "the schedule" found in Iowa Code section 85.34(2)(*a*)– (*t*), rather than under section 85.34(2)(*u*) as one of the factors bearing upon the nature and extent of an injured worker's industrial disability. Just as a first qualifying injury need not be a work-related injury, the method of calculating compensation for a first qualifying injury cannot be controlling on this issue. Moreover, the fact that the physical impairment of Gregory's left hand was presumably considered by the parties when they negotiated a compromise special case settlement of Gregory's claim for the 2000 injury will not impede the calculation of the Fund's credit for the compensable value of the partial loss of that enumerated member (two percent).[4]

We recognize the statute establishing the Fund has been characterized by commentators as a "narrow" second injury fund regime and that some jurisdictions have opted for statutory formulations with broader reach. *See* Harry W. Dahl, *The Iowa Second Injury Fund—Time for Change*, 39 Drake L. Rev. 101, 103 (1989–1990).[5] However, our

---

[4]As we have already noted, Gregory and Doorcraft agreed upon a lump sum special case settlement of the 2000 claim under Iowa Code section 85.35. Doorcraft paid $27,500 as a full and final settlement of that claim. The medical records supporting the settlement agreement approved by the commissioner evidenced Gregory sustained a two percent permanent impairment of her left hand as a consequence of the 2000 injury.

[5]For example, some other jurisdictions impose liability on their second injury funds without regard to whether a claimant's previous disabling injury was situated in

determination that Gregory's 2000 injury is a first qualifying injury under section 85.64 respects the General Assembly's choice of a comparatively narrow statute. The 2000 injury to Gregory's left hand qualifies as a first injury only because it was situated in an enumerated member and was not confined to an unenumerated part of her body.

Our decision in *George* and our disposition of the issues in this case are faithful to the well-established principle that chapter 85 is to be liberally construed in favor of the injured employee. In both instances, the Fund has advocated an interpretation of section 85.64 favoring claimants with fewer previously disabled body parts over claimants with a more complex array of disabilities. Our rejection of the Fund's interpretation conforms to our understanding that the General Assembly did not intend to disadvantage claimants with histories of more complex combinations of enumerated and unenumerated member injuries.

Gregory's claim for Fund benefits alleged a 2000 injury to her left hand as a first qualifying injury. The uncontroverted medical evidence in the record establishes that this injury resulted in a two percent functional impairment of that hand. The fact that Gregory combined in a single workers' compensation proceeding her claim for that scheduled loss with other scheduled and unscheduled injuries did not disqualify it as a first qualifying injury under section 85.64.

_____

an enumerated member. *See, e.g., Christie v. Coors Transp. Co.*, 933 P.2d 1330, 1335 & n.2 (Colo. 1997) (observing 1975 amendment to Colorado's statute expanded benefits by replacing a first-injury requirement that the employee "previously suffered the loss, or total loss of use, of one hand, one arm, one foot, one leg, or the vision of one eye" with a requirement of a "previous permanent partial industrial disability"); *Church v. McKee*, 387 A.2d 754, 757 (Me. 1978) (stating "[t]he legislature clearly intended to expand the kinds of pre-existing conditions which an employee could have and still be eligible for compensation from the Second Injury Fund" by moving from a "one hand, one arm" formulation to a broader formulation); *Am. Mut. Liab. Ins. Co. v. Commonwealth*, 398 N.E.2d 491, 495 (Mass. 1979) (concluding a previous version of Massachusetts statute that was analogous to Iowa's statute "provided relief in only a limited class of cases where the previous personal injury resulted in the actual or functional loss of hand, foot, or eye, and a subsequent injury of the same type resulted in further disability").

Our interpretation of section 85.64 permitting a loss of an enumerated member to qualify as a first injury for purposes of the Fund's liability notwithstanding the fact the injury was combined with disability to one or more unscheduled body parts for purposes of compensation under section 85.34(2)(*u*) will not result in a double recovery for Gregory. In determining the Fund's liability under section 85.64, the commissioner shall consider only the extent to which Gregory's earning capacity was diminished by the combined effect of the 2000 and 2002 losses to her *enumerated extremities*. *See* Iowa Code § 85.64. This new and discrete assessment by the commissioner of the loss of earning capacity for purposes of the Fund's liability shall consider only Gregory's disability to the left hand resulting from the 2000 injury and her disability to the right foot resulting from the 2002 injury. Accordingly, the assessment of the Fund's liability in this case will not provide additional compensation to Gregory for the loss of earning capacity resulting from any disability to other enumerated or unenumerated body parts arising from the injury in 2000.

**IV. Conclusion.**

We conclude the commissioner erred in interpreting section 85.64. Accordingly, we reverse the district court's judgment and remand this matter to the commissioner for further proceedings consistent with this decision.

**DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED.**

All justices concur except Cady, J., Ternus, C.J., and Streit, J., who dissent.

**CADY, Justice (dissenting).**

I respectfully dissent. I would affirm the district court. Gregory did not sustain a qualifying first injury.

The majority builds its decision upon the often-repeated declared purpose of the Iowa Second Injury Fund statute—to encourage the employment of disabled persons. *Second Injury Fund v. Shank*, 516 N.W.2d 808, 812 (Iowa 1994). While this observation is a part of our case law, it is incorrect and has likely contributed to an overly broad interpretation of our Second Injury Fund statute over the years. Today's decision by the majority continues this unfortunate trend.

In truth, the Second Injury Fund concept was not conceived to encourage employers to employ disabled workers. Instead, it was enacted to resolve a fundamental dilemma that surfaced early in the development of our workers' compensation law. This dilemma can be traced to a faulty assumption upon which the early compensation scheme was predicated. This early scheme assumed a worker, prior to a compensable injury, was a "normal [person], with a body and all members" that functioned normally. *Pappas v. N. Iowa Brick & Tile Co.*, 201 Iowa 607, 609, 206 N.W. 146, 147 (1925). Of course, not all workers have limbs and body parts that function normally. Thus, when a worker with an existing disability suffers a work-related injury, the disability produced by combining the existing disability and the new injury can be "far greater than would be reflected by merely adding together the schedule allowances for each injury existing separately." 5 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law* § 90.01, at 90–2 (2009) [hereinafter *Larson's Workers' Compensation*]. A classic example of the successive injury problem is a leg amputee who loses a

second leg in a work-related accident. The problem, of course, is "[t]he loss of a leg, which would ordinarily mean only partial disability to a normal person, results in total disability to the man who has already, from whatever cause, lost the other leg." *Id.* This dilemma impacts both the disabled worker and the employer and is responsible for the tension that gave rise to the need for a Second Injury Fund statute.

For employees faced with such successive injuries, a fair compensation system would include compensation for the additional disability produced by the combined effect of the injury to an employee with the existing disability. For employers faced with successive injuries to employees, a fair system of compensation would not impose liability for disability not caused by the employment. Some courts sided with the employee by holding the employer fully responsible for the total disability from successive injuries, while other courts sided with the employer by apportioning responsibility for successive injuries by limiting the responsibility of the employer to the disability caused only by the second injury.

In recognizing the merits of both positions, the Second Injury Fund was conceived as a legislative solution to the dilemma courts were forced to grapple with by adopting one side or the other, or by fashioning some form of apportionment. One of the first cases to discuss the successive-injury dilemma was from the state of New York in 1915. In this case, a worker named Jacob Schwab had his left hand amputated in 1892 for an unknown reason and later suffered the severance of his right hand in a work-related accident. *Schwab v. Emporium Forestry Co.*, 153 N.Y.S. 234, 235 (N.Y. App. Div. 1915). The court found the employer liable for Schwab's total permanent disability, rejecting the employer's argument that it should be responsible only for the scheduled amount for the loss

of the right hand. *Id.* at 236. The next year, the New York legislature responded with a novel solution—the country's prototype second-injury-fund law. Harry W. Dahl, *The Iowa Second Injury Fund—Time for Change,* 39 Drake L. Rev. 101, 104 (1989) [hereinafter Dahl]. The New York law provided second-injury-fund compensation for "an employee who has previously incurred permanent partial disability through the loss of one hand, one arm, one foot, one leg, or one eye, [and who] incurs permanent total disability through the loss of another member or organ . . . ." 1916 N.Y. Laws 2045.

As early as 1919, we confronted the successive-injury dilemma by holding the employer responsible for the resulting total disability. *Jennings v. Mason City Sewer Pipe Co.,* 187 Iowa 967, 971, 174 N.W. 785, 786 (1919). Yet, we subsequently interpreted two statutory amendments relating to the successive-injury problem by requiring the subsequent injury be "apportioned according to the proportion of incapacity and disability caused by the respective injuries." *Pappas,* 201 Iowa at 612, 206 N.W. at 148. Importantly, we acknowledged the hardship this limited recovery would place on the employee, even in light of our rule of liberal construction of compensation statutes. *Id.* at 613, 206 N.W. at 149.

At the time of these early cases, the idea of a Second Injury Fund in Iowa to pay for the additional disability produced by the combined effect of successive injuries was not a vision shared by our legislature. Nor did the concept become an immediate national phenomenon. By 1945, however, a different attitude had surfaced around the country. During World War II, hospital ships laden with disabled veterans returned to America, prompting lawmakers to examine the laws and programs that would aid the returning soldiers. *See* Dahl at 104

("Second injury funds became popular at the end of World War II as an attempt to remove obstacles facing disabled veterans who were re-entering the job market.").

Around the same time, data began to emerge from around the country to show handicapped workers in states that did not apportion responsibility for successive injuries were at a competitive disadvantage due to the full responsibility rule. *See Larson's Workers' Compensation* § 91.01, at 91–2 (stating "[a]s soon as it became clear that a particular state had adopted a rule requiring an employer to bear the full cost of total disability for loss of the worker's remaining leg or arm, employers had a strong financial incentive to discharge all workers who might bring upon them this kind of aggravated liability"). The competitive disadvantage occurred because employers did not want to become liable for the combined disability of successive injuries by hiring or retaining handicapped workers. *Id.*

Consequently, in those states that followed the full responsibility rule for employers, the Second Injury Fund statute was viewed as a means to encourage the employment of handicapped workers by making the current employer only responsible for the disability caused by a second injury. *Id.* at 91–4. This observation is the source of the statutory purpose declared by the majority. Yet, in states like Iowa, that already protected employers from full responsibility for successive injuries, the Second Injury Fund statute was not needed to encourage the employment of handicapped workers by making the current employer responsible only for the disability caused by the current employment. *See* Lee M. Jackwig, *The Second Injury Fund of Iowa: How Complex Can a Simple Concept Become?*, 28 Drake L. Rev. 889, 890–91 (1978–1979) (recognizing that employers were not liable for the total disability of

successive injuries at the time the Second Injury Fund was adopted, but were only liable for the loss caused by the second injury). Instead, the purpose of adopting the Second Injury Fund statute in states like Iowa was simply to provide a remedy for inadequate awards to handicapped workers caused by the apportionment of disability. *Id.* at 891 (recognizing purpose of Second Injury Fund was to provide means to fully compensate a worker for the combined total of successive injuries).

It simply makes no sense for us to continue to proclaim a false legislative purpose behind Iowa's Second Injury Fund statute. Moreover, it is not merely an academic debate at stake. It is important to correctly articulate the legislative purpose of all statutes because the statutory purpose guides us in the interpretation of the statute. Courts risk making an incorrect interpretation of a statute by failing to recognize the true purpose of the statute.

If there is a single element of clarity under the statute, it is that the legislature did not intend to include all handicapped workers under its umbrella. Instead, the language of the Second Injury Fund statute only includes persons who had previously lost, or lost the use of, "one hand, one arm, one foot, one leg, or one eye." Iowa Code § 85.64 (2001). Thus, the legislature clearly did not intend to include handicapped persons due to a disability to other parts of the body, such as the back, neck, hip, or shoulder. *See Second Injury Fund v. Nelson*, 544 N.W.2d 258, 269 (Iowa 1995) (providing examples of unscheduled injuries). This cannot be disputed.

While there may be no clear explanation why the statute would give special benefits (full compensation for combined effects of successive injuries) to some handicapped workers and not others, such line drawing is not up to courts, but is done by the legislature, who is responsible for

doling out benefits based on limited resources and policy making. Nevertheless, the fundamental question is whether the legislature intended for the Second Injury Fund statute to cover handicapped workers with an existing disability that extended to both a specified and unspecified portion of the body.

In my mind, the portion of the Second Injury Fund statute that provides the greatest clarity in answering this question is the language that requires "the compensable value of the previously lost member or organ" to be deducted from the Second Injury Fund award. Iowa Code § 85.64. In other words, the Second Injury Fund statute makes the employer "liable only for the degree of disability" as if there was "no pre-existing disability." *Id.* Once the employer has completed making such payments, the statute makes the Fund responsible for paying the remainder of the total combined disability. *Id.* However, since this total combined disability necessarily includes the first injury that was previously compensated by a workers' compensation award if it was work-related (or not compensated as a nonwork-related injury or disability), the statute requires "the compensable value of the previously lost member or organ" to be deducted from the Second Injury Fund award to prevent double recovery. *Id.* As such, the Second Injury Fund statute works as it should—to provide fair compensation to those handicapped workers chosen by the legislature to receive benefits.

Importantly, the phrase "previously lost member or organ" in the deduction portion of the statute refers only to the first injury or disability to "one hand, one arm, one foot, one leg, or one eye," not the back, neck, shoulder, or hip. *See id.* ("If an employee who has previously lost, or lost the use of, one hand, one arm, one foot, one leg, or one eye, becomes permanently disabled by a compensable injury which has resulted in the

loss of or loss of use of another *such member or organ . . . .*" (emphasis added)).  Thus, the statute clearly only mandates that the compensable value of the first injury to a hand, arm, foot, leg, or eye be deducted from the compensation paid by the Fund.  If the statute is interpreted to include handicaps involving both a hand, arm, foot, leg, or eye and another area of the body (back, neck, shoulder, or hip), there is no corresponding language in the statute directing the prior compensable value of the back, neck, shoulder, or hip to be deducted.  As a result, if the Second Injury Fund statute is interpreted to include first injuries or disabilities that extend to the back, neck, shoulder, or hip, then the handicapped worker with such a disability will be compensated twice for a portion of the first injury or disability, or will be compensated for a nonwork-related disability.  This clearly could not have been the intent of the legislature.

The majority obviously recognizes the absence of any language in the statute that calls for the full amount of the first injury to be deducted from the amount of compensation payable by the Fund.  They, of course, avoid this flaw by simply directing the commissioner to determine the new combined disability based on the combined effect of only the first and second qualifying injuries, ignoring the portion of the prior disability, and the new combined disability, attributable to the nonqualifying portion of the first injury covering the back, neck, shoulder, or hip.  Thus, the majority lowers the threshold of the statute to include workers with comprehensive disabilities (handicap due to injuries to both qualified and nonqualified parts of the body under the statute) by simply directing the commissioner to apply the statute as if workers are burdened with a different, less severe disability.  While we strive to interpret workers' compensation statutes liberally in favor of the worker,

the majority's maneuver goes well beyond any acceptable rule of construction. The majority is no longer interpreting the statute, but rewriting the statute. Such an approach has serious and broad implications.

Moreover, the approach adopted by the majority falls well short of the true goal of the statute to provide full compensation for disabled workers who suffer a new injury. If the commissioner must ignore the true nature of the first disability in applying the statute as directed by the majority, then the worker will likely not be fully compensated for the true combined disability that results when the existing disability is combined with the new injury. Of course, the majority is able to accept this result by continuing to maintain that the purpose of the statute was merely to encourage employment of disabled workers, instead of recognizing its true fundamental goal of full compensation.

I agree the Second Injury Fund is confusing, if not outdated, and even perhaps unfair as it is currently written. However, it is not up to the courts to rewrite a statute. Instead, the legislature is the governmental body that should revisit the statute and decide whether or not it should be extended to include handicapped workers with whole body injuries as the first injury.[6]

For those reasons, I respectfully dissent.

Ternus, C.J., and Streit, J., join this dissent.

---

[6]It has been suggested that Second Injury Fund statutes in those states that impose low thresholds have become expensive and counterproductive. *Larson's Workers' Compensation* § 91.03(8), at 91–58. Low thresholds can tend to place such states at a competitive disadvantage to neighboring states with high thresholds by requiring larger annual assessments or the imposition of other funding burdens thought to discourage new business. *Id.* Many states have eliminated or severely restricted their Second Injury Funds, including Nebraska, Minnesota, and South Dakota. *Id.* at 91–58.1.