TELECONNECT COMPANY, Appellee,

v.

IOWA STATE COMMERCE
COMMISSION, Appellant,

AT & T Communications of the Midwest,
Inc. and Northwestern Bell Telephone
Company, Intervenors-Appellants.

No. 86–514.

Supreme Court of Iowa.

April 15, 1987.

Susan Allender, Patrick J. Nugent, and David J. Lynch, Des Moines, for appellant Iowa State Commerce Commission.

Mark McCormick, Dennis J. Nagel, and Donald G. Henry of Belin, Harris, Helmick, Tesdell, Lamson, Blackledge & McCormick, P.C., Des Moines, for intervenor-appellant AT & T.

William K. Schaphorst and Richard W. Hoffmann, Des Moines, for intervenor-appellant Northwestern Bell.

Thomas M. Collins, Richard C. Garberson, Allan W. Vestal, and David D. Vestal of Shuttleworth & Ingersoll, P.C., Cedar Rapids, for appellee.

LAVORATO, Justice.

In this judicial review proceeding, the respondent, Iowa State Commerce Commission (commission), and two intervenors, AT & T Communications of the Midwest, Inc. (AT & T) and Northwestern Bell Telephone Company (NWB), appeal from the district court's ruling that invalidated the commission's rules relating to access charges to be

paid by the petitioner, Teleconnect Company (Teleconnect), and other long-distance telephone companies for the local connections and services necessary to make a long-distance call. Because the district court erred in concluding the commission acted unreasonably, arbitrarily, or capriciously in promulgating the rules, we reverse.

As a result of a federal antitrust action, AT & T was required to divest itself of its Bell Operating Companies (BOCs), including NWB. *United States v. American Tel. & Tel. Co.*, 552 F.Supp. 131 (D.D.C. 1982), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983). Since the effective date of divestiture, January 1, 1983, BOCs have been prohibited from providing long-distance service outside specified, geographically based exchange areas. All intrastate, interexchange long-distance service is now provided by interexchange utilities (IEUs) such as AT & T, Teleconnect, and other competitors. The IEUs can link each end of long-distance calls to and from their customers through the customers' telephone connections to local exchange utilities (LEUs) like NWB and small independent local telephone companies.

Prior to the divestiture of AT & T and the BOCs, AT & T compensated LEUs like NWB for the use of the LEUs' facilities through settlement agreements. The settlement agreements ended with the divestiture. Pursuant to its rule-making authority in Iowa Code chapters 17A and 476, the commission initiated rule-making proceedings to adopt access charge rules, which are the subject of this appeal, to replace the settlement agreements.

Rule-making procedures on the access charges were begun by commission order on May 6, 1983. Written comments were received from the public, and an oral comment proceeding was held on July 11, 1983.

On September 23, 1983, the commission promulgated rules on access charges on an emergency basis, effective December 1, 1983. The rules were intended to compensate the LEUs providing exchange services for the cost of providing access to the intrastate interexchange network. The rules instituted a two dollars per month charge on each residential line, a six dollars per month charge on each business line, and a three cents per minute per call charge to each IEU. At the same time, the commission continued the rule-making proceeding to take written comments from the public no later than November 2, 1983.

On November 4, 1983, the commission rescinded the emergency rules adopted on September 23 with the exception of the three cents per minute per call charge and adopted new emergency rules to be effective January 1, 1984. Again, the commission continued the rule-making proceedings to allow an opportunity for written and oral comments. The deadline for the filing of written comments was set for December 14, 1983, and a hearing for receiving oral comments was scheduled for December 20, 1983.

On November 10, 1983, the commission initiated different rule-making proceedings to clarify the distinction between the emergency rules adopted on November 4, which did not provide for the two dollars and six dollars per month charges, and the new proposed rules which did provide for such monthly charges. The rules, as finally adopted on February 24, 1984, include the three cents per minute charge but do not include the two dollars and six dollars per month charges.

Teleconnect's petition for judicial review, challenging the emergency rules effective January 1, 1984, was filed December 30, 1983, pursuant to Iowa Code section 476.13 (1983). Teleconnect challenged the commission's rules because the access charges set were the same for all IEUs, rather than being adjusted downward for companies, like itself, receiving access service inferior to that provided AT & T.

Because of technical limitations in the exchange connections, which had been designed in a monopolistic setting, the access service made available to Teleconnect and other competitors is inferior in various respects to the access service available to AT & T. Disadvantages of the inferior access include the following: it cannot be used for

long-distance calling via unmodified rotary dial telephones, the long-distance caller must dial more than twice the number of digits than an AT & T customer, the connection is slower, and the fidelity and volume are not as good as on AT & T accessed calls.

The thrust of Teleconnect's challenge is stated in paragraphs 3 and 4 of its petition:

3. [The commission] has heretofore entered Orders (copies are attached and made a part hereof) allowing the Local Operating Companies (primarily Northwestern Bell Telephone Company, but including all other Local Operating Companies) to charge a 3 cents per minute long-distance access charge to any long-distance company utilizing the Local Operating Companies lines or facilities.

4. The rule as promulgated treats all long-distance companies the same and provides for the same 3 cents per minute charge to all such providers. It is this portion of the rule to which the Petitioner objects and seeks relief for the reason that the Local Operating Companies provide long-distance access to AT & T that is much superior to the long-distance access provided to Petitioner, (and all others) and thus to charge AT & T and Petitioner the same amount is discriminatory, unfair, unjust and an abuse of the powers placed with the Commission.

The same day the petition was filed the district court ordered a stay of the operational effect of the new rules with respect to Teleconnect. When notified of the stay, which was ordered ex parte and without bond, the commission moved to dissolve it. Subsequent to the district court's refusal to dissolve the stay, the commission brought an interlocutory appeal, and we reversed the order of the district court granting the stay. *See Teleconnect Co. v. Iowa State Commerce Comm'n*, 366 N.W.2d 511, 514 (Iowa 1985). The issues raised by the dismissal of Teleconnect's petition for judicial review of a separate commerce commission action were addressed by us in *Teleconnect Co. v. Iowa State Commerce Comm'n*, 366 N.W.2d 515 (Iowa 1985) (district court's dismissal of administrative appeal affirmed).

On February 6, 1984, AT & T filed its petition to intervene and, on February 16, 1984, NWB filed its petition to intervene.

On March 14, 1984, the district court allowed an amendment to Teleconnect's petition to include the commission's February 24 final order adopting the rules. *See* 250 Iowa Admin.Code 22.14 (1984) (current version at 199 Iowa Admin.Code 22.14 (1986)).

After hearing, the district court ruled that the commission's action in promulgating the rules violated Iowa Code section 17A.19(8)(g) in that it was "unreasonable, arbitrary or capricious." The court remanded the matter to the commission with directions to adopt access charge rules implementing a favorable access charge differential for users, like Teleconnect, of Feature Group A (inferior) access.

On appeal, the commission and intervenors raise a number of issues. We pass all but the one that is dispositive of this appeal: whether the district court erred in finding that the commission's action in promulgating the access charge rules was unreasonable, arbitrary, or capricious.

## I. *Scope of Review.*

Judicial review of acts of the commission is provided for in Iowa Code section 476.13 (1983), which implements Iowa Code chapter 17A. *Community Action Research Group v. Iowa State Commerce Comm'n*, 275 N.W.2d 217, 218 (Iowa 1979). Under the Iowa Administrative Procedure Act there are three types of administrative actions: (1) informal agency adjudication; (2) contested case, sometimes called formal adjudication; and (3) rule-making. *Id.* at 219. This judicial review proceeding arises out of an exercise of the commission's rule-making powers granted under Iowa Code sections 17A.3, 17A.4, and 476.2.

When the district court exercises the power of judicial review conferred by section 17A.19(8), it functions in an appellate capacity to correct errors of law on the part of the agency. *Barnes v. Iowa Dep't of Transp.*, 385 N.W.2d 260, 263 (Iowa

1986); *LeFebure Corp. v. Iowa Dep't of Job Serv.,* 341 N.W.2d 768, 770 (Iowa 1983); *Iowa Pub. Serv. Co. v. Iowa State Commerce Comm'n,* 263 N.W.2d 766, 769 (Iowa 1978). In our review of such action by the district court, we merely apply the standards of section 17A.19(8) to the agency action to determine whether our conclusions are the same as those of the district court. *Barnes,* 385 N.W.2d at 263; *LeFebure,* 341 N.W.2d at 770.

The district court determined that the commission's actions in promulgating its rules concerning intrastate access charges violated Iowa Code section 17A.19(8)(g) in that they were "unreasonable, arbitrary or capricious." Section 17A.19(8)(g) authorizes the district court to grant appropriate relief from agency action which is "[u]nreasonable, arbitrary or capricious or characterized by an abuse of discretion or a clearly unwarranted exercise of discretion."

An agency rule is not unreasonable, arbitrary, or capricious "[i]f a rational agency could believe that the rule is related to achieving a legitimate purpose within the agency's authority, and that the means chosen are not so disproportionate to the proper ends sought as to be unconscionable...." Bonfield, *The Iowa Administrative Procedure Act: Background, Construction, Applicability, Public Access to Agency Law, the Rulemaking Process,* 60 Iowa L.Rev. 731, 908 (1975); *see also* B. Schwartz, *Administrative Law* § 57, at 152 (1976); 2 Am.Jur.2d *Administrative Law* § 303, at 132 (1962) ("[Rules] are invalid if shown to bear no reasonable relation to the purposes for which they are authorized to be made.").

■ An agency rule is presumed valid and the burden is on the party challenging it to demonstrate that a "rational agency" could not conclude the rule was within the agency's delegated authority. *Iowa-Illinois Gas & Elec. Co. v. Iowa State Commerce Comm'n,* 334 N.W.2d 748, 751–52 (Iowa 1983). In reviewing an agency rule, the court is required to recognize the expertise of an administrative agency, resulting in a reasonable range of informed discretion. *Davenport Community School Dist. v. Iowa Civil Rights Comm'n,* 277 N.W.2d 907, 910 (Iowa 1979); *City of Davenport v. PERB,* 264 N.W.2d 307, 312 (Iowa 1978).

II. *District court's finding of unreasonable, arbitrary, or capricious action by the commission.*

Teleconnect concedes the commission had authority to promulgate rules concerning intrastate access charges and concedes the commission did not exceed its authority delegated by the legislature. Notwithstanding these concessions, Teleconnect contends on appeal, as it did in the district court, that the promulgated rules are unreasonable.

Teleconnect contends the district court was correct in holding that the access charge rules were unreasonable, arbitrary, or capricious because the rationale expressed by the commission in denying Teleconnect and other similarly situated IEUs a discount for any access charges was not supported by the record. The rationale referred to is the commission's response to Teleconnect's statement filed during the rule-making process. In that statement, Teleconnect urged the commission to charge AT & T a premium access charge to reflect AT & T's higher quality access.

Responding to Teleconnect's statement, the commission wrote:

Some commenters suggested that AT & T should pay a premium charge (that is, a higher carrier's common line charge for each minute of use) to reflect its higher-quality access. AT & T disagreed, stating that the other carriers could get better access than they currently have and that in some ways their access is superior to AT & T's.

The commission has discussed this issue in its earlier orders. The access available to the other long-distance carriers [like Teleconnect] is at least partially a function of what those carriers are willing to pay. *Better access than what they currently use is usually available, albeit at a higher cost. They have chosen to buy the lesser access. This is one reason that they are able to charge their customers a lower price. In addition, the better access provided to AT &*

*T represents a rough equalization of the relative positions of AT & T and the other common carriers [like Teleconnect].... AT & T and Northwestern Bell are currently obligated to provide long-distance service to all exchanges and all customers.* [The other IEUs like Teleconnect] have the option of serving customers selectively, along certain, more profitable routes only. Finally, it should be noted that the *unequal access problem is, for the majority of exchanges, a temporary condition only.* Pursuant to court order, Northwestern Bell must provide [other IEUs like Teleconnect] with equal access by September of 1986.

(Emphasis added.)

According to the district court the record did not support the commission's statements:

The record upon which this review is had discloses that: [Teleconnect and the other IEUs] did not have a viable alternative ... therefore, they did not choose inferior access to gain a market advantage; and the unequal access problem is not a temporary condition only. [The record] does not show a demonstrated relationship between the higher-quality access which AT & T has and its providing of long-distance service to all exchanges and all customers to be such that one necessarily offsets the burden imposed by the other.

The district court remanded the case to the commission with directions to "adopt access charge rules implementing a favorable access charge for users [like Teleconnect] of feature group A [inferior] access."

■ The determination of whether the commission's action was unreasonable, arbitrary, or capricious does not turn on whether there is sufficient evidence in the record to support the foregoing statements of the commission. Rather, the determination turns on whether there is a rational relationship between the rules and their purpose, a standard which neither Teleconnect nor the district court addressed.

The commission and the intervenors assert two major justifications for the rules:

(1) cost-based pricing rather than value-based pricing, and (2) the unique universal service obligation imposed on AT & T. We conclude both demonstrate a rational relationship between the rules and their purpose.

### A. Cost-based pricing.

The commission's purpose in adopting the access rules is to compensate the LEUs like NWB for providing access to IEUs like AT & T and Teleconnect. Prior to January 1, 1984, local telephone companies recovered these costs from long-distance carriers through settlement agreements. On February 28, 1983, the Federal Communications Commission (FCC) ordered elimination of the settlement agreements effective January 1, 1984. The commission commenced rule-making proceedings to develop access charges to replace the settlement agreements. The commission chose to use cost rather than value to price this access service. In doing so, it was following its long-standing policy in rate-fixing of using cost rather than fair value as a means of determining a rate base. *See Davenport Water Co. v. Iowa State Commerce Comm'n,* 190 N.W.2d 583, 602 (Iowa 1971) (Commerce Commission did not err in using "original cost or prudent investment" in determination of reasonable and just water utility rate base rather than "fair value or reproduction cost.").

The commission points out that it received no comments during the rule-making proceedings indicating that the type of access Teleconnect receives is cheaper than the access AT & T receives. Thus, the commission set the charge for both types of access services at the same level to allow NWB and other LEUs to recover the same level of cost.

■ The commission concedes the FCC adopted a discount rate to promote competition in interstate interexchange carrier markets. *See MTS & WATS Mkt. Structure,* 97 F.C.C.2d 682, 729 (1983) ("Our goal is to ensure that an appropriate competitive balance is maintained during the transition."). The commission properly points out that there is nothing in chapter 476

imposing a duty on the commission to promote competition. In fact, 1983 Iowa Acts chapter 127, section 15 (codified at Iowa Code section 476.1 (1985)) provides that "jurisdiction of the commission as to the regulation of communications services is not applicable to a service or facility provided by a telephone utility that is or becomes subject to competition, as determined by the commission." Hence, Iowa has no policy for promoting competition among regulated industries.

■ We agree with the commission that the FCC's policy in favor of an access charge discount is limited to interstate services and does not preempt state regulatory authorities with respect to intrastate charges. *See MTS & WATS*, 97 F.C.C.2d at 762 ("Our access charge plan addresses solely interstate services, and not intrastate services over which the states exercise authority.").

The commission explained its reasons for adopting an access charge of three cents per minute of use (MOU) in its order adopting the rules issued February 24, 1984:

The 3¢/MOU charge is the second major issue raised in the comments.... There are several different theories and analyses concerning the costs of access to the long-distance network and the allocation of costs between long-distance and local service. These theories support a broad range of figures, no one of which is absolutely "correct." Since the charge is meant to allocate joint costs, it necessarily requires the application of judgment. In addition, the impact of any charge varies depending on the conditions affecting any individual local operating company. The commission can only look at the relative impact of the range of figures and select a figure which, in its judgment, provides the best results. Assessing the impact of the 3¢/MOU charge, it appears that while the revenue generated for the local exchange utilities will be less than the revenue received under the former settlement agreements, the charge still represents the best compromise. Raising the charge higher would generate excessive

revenues for some exchange companies. Reducing the charge would lead to severe revenue shortfalls for some exchange companies. The commission has set the charge at three cents per minute of use and will assess the effect on the various local exchange utilities through rate case proceedings.

Thus, the commission based its rules on a cost-of-service theory. Teleconnect does not challenge the three cents per minute of use as unreasonable. What it is seeking is a discount from that charge to reflect the fact that its access is competitively inferior to AT & T's. In effect, Teleconnect seeks a value-of-service pricing which is contrary to the commission's policy of cost-of-service pricing to compensate the LEUs for their costs in providing access.

The district court did not address the cost-of-service policy. Instead the court made a policy decision that value-of-service pricing should replace cost-of-service pricing, a policy decision properly within the domain of the commission rather than the court. *See Davenport Water Co.*, 190 N.W.2d at 592 ("Furthermore, since [the] commission's rate-fixing power is, as aforesaid, legislative in nature, we have no authority to determine whether it acted wisely in adopting any policy or plan merely because it is or is not to our liking.").

In his deposition, the commission chairman explained more fully the commission's cost-of-service policy:

A. The access rules were adopted attempting to reflect costs-of-service, the cost of providing the services of the local exchange to long-distance carriers. We make no attempt to determine economic value of any particular long-distance service. That's something the market would determine.

. . . .

A. You know, we didn't ignore it [the Teleconnect discount approach], if that's your question. We did think about it but we didn't—we concluded that that was not the right approach.

Q. Why did you conclude [the Teleconnect discount approach] was not the right approach? A. Because [to allo-

cate] the cost based on minutes of use for those facilities seemed by far the fairest approach to us.

. . . .

A. The conclusion was that allocating the cost for use of the local exchange should be indifferent as to the source of the toll call.

Q. ... Shouldn't a company, long-distance company which uses Feature Group A access [like Teleconnect's] pay a lesser cost for that access than the company which uses and whose customers use a higher quality Feature Group C access [AT & T's]? A. The answer is that the access charge that we set is to reflect their use, the company's use of that local exchange facility, and that use ties up the switch in the local loop for the same amount of time, presumably [depriving] service from being able to connect to that local phone. We found no reason why that charge should be different for the use of that local facility.

Similarly, during the rule-making proceedings, one economist emphasized that the prices of a telecommunications company, including access charges, should be based upon the cost of providing its service: . .

Whenever prices depart from marginal cost, losses to economic efficiency are incurred. When price is above marginal cost, the quantity sold will be too small, meaning that some additional sales would be possible which would be of benefit to parties on both sides of the market. If price is set below marginal cost, the quantity sold will be unnecessarily stimulated to include sales for which the benefits received are less than the costs of provision.... The important general point that I would like to leave with the Commission is that the day of a competitive telecommunications industry is upon us, and competition will eventually drive all rate elements to the vicinity of cost. In the long run, it will be impossible to subsidize one telecommunications service from another, and therefore this Commission should prepare for the transition to a competitive telecommunications market, not by try-

ing to thwart such competition, something which will be both impossible and damaging to consumers in the long run, but by moving toward cost-based pricing as soon as possible.

Moreover, the record is clear that allowing Teleconnect a discount on access charges would probably leave LEUs like NWB with a loss of revenues which they would attempt to recover by charging local Iowa resident ratepayers higher rates.

■ We are convinced the record amply supports a rational basis for the commission's decision to use a flat rate based on cost to compensate LEUs for providing access. Teleconnect has not met its burden to overcome the presumption of the validity of the rules. The most that can be said of Teleconnect's position is that it has provided one policy, value-based pricing, that the commission could have chosen to compensate LEUs for providing access. That the commission chose another policy, its long-standing cost-based pricing, was well within its "reasonable range of informed discretion." *Davenport Community School Dist.*, 277 N.W.2d at 910; *see also City of Davenport*, 264 N.W.2d at 313. The choice represented a "judgment [call which is] the province of the administrative tribunal and not of the courts." *Mercy Health Center v. State Health Facilities Council*, 360 N.W.2d 808, 809 (Iowa 1985).

B. *Unique universal service obligation.*

The commission's second justification in adopting its access rules reflects AT & T's unique service obligation. In denying Teleconnect and other similarly situated IEUs access charge discounts, the commission determined that

the better access provided to AT & T represents a rough equalization of the relative positions of AT & T and the other [IEUs like Teleconnect]. On the one hand, AT & T and Northwestern Bell enjoy higher-quality access. On the other hand, only AT & T and Northwestern Bell are currently obligated to provide long-distance service to all exchanges

and all customers. The [other IEUs like Teleconnect] have the option of serving customers selectively, along certain, more profitable routes only.

Teleconnect argues that there is no sufficient evidence in the record to support the commission's rough equalization rationale. The district court apparently agreed because it found that the record did not "show a demonstrated relationship between the higher quality access which AT & T has and its providing of long-distance service to all exchanges and all customers to be such that one necessarily offsets the burden imposed upon by the other."

■ To support its determination, the commission points to written comments filed during the rule-making proceedings by Bell System Iowa Interexchange Organization (BSIIO), a Northwestern Bell subsidiary transferred to AT & T at the time of the divestiture:

> Further, BSIIO will, in any event, incur additional costs which ultimately must be paid by its subscribers. As a primary provider of the public-switched network, BSIIO, and only BSIIO, will provide ubiquitous inter-Lata services. OCCs [like Teleconnect] have not operated with this responsibility. BSIIO, unlike any other inter-exchange carrier, must design its network to maintain service in low volume calling areas avoided by OCCs skimming the cream and high volume markets; and BSIIO must attempt to serve as the carrier of last resort in case of disaster. These obligations add costs to BSIIO's business, and wholly apart from any premium, will provide OCCs a price advantage. An additional price advantage that would result from a premium is, thus, completely uncalled for.

Because of the nature of the proceedings, rule-making, the commission was entitled to give weight to written comments. *See generally* 1 K. Davis, *Administrative Law Treatise* ch. 6, at 447–634 (2d ed. 1978). Moreover, our review of the record in the rule-making proceedings reveals no written or oral statements controverting BSIIO's written comments.

It is uncontroverted that AT & T serves all Iowa local exchange carriers and cannot abandon service to an exchange, no matter how unprofitable, without the permission of the commission. *See* Iowa Code § 476.-20. It is also uncontroverted that Teleconnect is not similarly obligated; it can choose to enter only those markets which are profitable. In short, the commission determined that any competitive advantage enjoyed by AT & T by its superior access was offset by Teleconnect's competitive advantage to choose whatever markets it may wish to enter—a choice not enjoyed by AT & T. Thus, the commission made a policy decision that Teleconnect needed no further competitive advantage via discounted access charges to offset any disadvantage from its inferior access. We conclude this policy decision involved "regulatory expertise which is confided to the commission." *See Northwestern Bell v. Iowa State Commerce Comm'n*, 359 N.W.2d 491, 499 (Iowa 1984); *United Tel. Co. v. Iowa State Commerce Comm'n*, 257 N.W.2d 466, 480–81 (Iowa 1977).

At least one other jurisdiction has found a rational relation between the competitive disadvantage of the obligation of universal service on the one hand and inferior access service on the other:

> Moreover, as the ALJ [Administrative Law Judge] noted, [AT & T] is itself competitively disadvantaged in being required to serve all interLATA routes, while the OCCs [like Teleconnect] are permitted to select only the most profitable ones. The ALJ's recommendation [reducing access charge premium to be paid by AT & T] seems to us to fall within the area where a court may not substitute its judgment for that of the regulatory agency "giving fair consideration to the expertise possessed by the commission in weighing the impact of rate-fixing factors on both the utilities and the consuming public."

*MCI Telecommunications Corp. v. Public Serv. Comm'n*, 108 A.D.2d 289, 488 N.Y. S.2d 840, 846 (1985) (citations omitted). In *MCI*, the court recognized that (1) the benefits of premium access are offset by the

requirement of providing universal service, and (2) the decision to give these offsetting factors weight in fixing access charge premiums falls directly within the area where the court may not substitute its judgment for that of the regulatory commission.

We conclude the record reasonably supports the "rough equalization" rationale put forth by the commission as a justification for denying discounted access charges to Teleconnect and other similarly situated IEUs.

### III. *Disposition.*

Because the record amply demonstrates a rational relationship between the access charge rules and their purpose, we hold that the commission's action in promulgating the rules was not unreasonable, arbitrary, or capricious. The district court erred in concluding otherwise. Accordingly, we reverse the decision of the district court and uphold the access charge rules.

REVERSED.

All Justices concur except REYNOLDSON, C.J., and SCHULTZ and CARTER, JJ., who take no part.