# IN THE SUPREME COURT OF IOWA

No. 13–0474

Filed May 29, 2015

Amended August 12, 2015

**WARREN PROPERTIES** and **ACE AMERICAN INSURANCE COMPANY,**

Appellees,

vs.

**JANICE STEWART,**

Appellant.

Appeal from the Iowa District Court for Polk County, Christopher L. McDonald, Judge.

A workers' compensation claimant appeals the district court ruling on judicial review of a decision of the Iowa Workers' Compensation Commissioner. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH DIRECTIONS.**

Martin Ozga of Neifert, Byrne & Ozga, P.C., West Des Moines, for appellant.

Mark A. King and Jason W. Miller of Patterson Law Firm, L.L.P., Des Moines, for appellees.

Matthew D. Dake of Wertz & Dake, P.C., Cedar Rapids, for amicus curiae Workers' Compensation Core Group.

**CADY, Chief Justice.**

In this workers' compensation appeal, we are asked to revisit our rule governing apportionment resulting from successive work injuries at multiple places of employment in light of the 2004 amendments to the workers' compensation permanent disabilities statute. The deputy workers' compensation commissioner awarded benefits to the worker based on a finding of two successive injuries to the back and a shoulder injury and applied the full-responsibility rule with no apportionment for the preexisting disability. Our review follows reviews by the workers' compensation commissioner, who affirmed, and the district court, which affirmed in part, reversed in part, and remanded. We conclude an employer who is liable to compensate an employee for a successive unscheduled work injury is not liable to pay for the preexisting disability that arose from employment with a different employer or from causes unrelated to employment when the employee's earning capacity was not reevaluated in the competitive job market or otherwise reevaluated prior to the successive injury. We affirm in part and reverse in part the decision of the district court. We remand the case to the district court to remand the case back to the workers' compensation commissioner for further proceedings consistent with this opinion.

### I. Background Facts and Proceedings.

Janice Stewart was working two jobs in 2006. She had begun working as an assistant property manager for a business in Des Moines called Warren Properties in 2005. Her duties included typing, answering the phone, showing apartments to prospective tenants, inspecting property, and preparing rental agreements. Stewart received a salary and a rent allowance for this work. In June 2006, Stewart began a

second full-time job with Wal-Mart. She worked as a customer service representative and assistant manager.

In November 2006, Stewart injured her lower back at Wal-Mart while moving shopping carts. She quit the job a week later, but continued working for Warren Properties. Stewart began seeking medical treatment for her back injury. She saw a variety of doctors over a period of several years for treatment and evaluation.

In May 2008, Dr. Cassim Igram determined Stewart had reached maximum medical improvement for her back injury and concluded she sustained a ten percent permanent impairment of the body as a whole. Two months later, Dr. William Boulden expressed the same opinion. In October 2008, Dr. Daniel McGuire expressed an opinion that Stewart suffered a thirteen percent permanent physical impairment as a consequence of her back injury.

On May 20, 2009, Stewart and Wal-Mart entered into an agreement for settlement on her claim for workers' compensation benefits. The settlement was based on a forty percent industrial disability determination. It resulted in the payment of $60,000 in compensation, plus $11,000 in medical bills.

Stewart continued her employment at Warren Properties throughout the duration of the medical treatment for her 2006 back injury. On the evening of February 2, 2009, she fell on ice as she left work. This was more than three months prior to her agreement for settlement with Wal-Mart. She experienced back pain with radiating pain down one leg as well as pain in her shoulders and neck. As with the Wal-Mart injury, Stewart sought medical treatment following her fall and saw a variety of doctors for treatment and evaluation.

An evaluation in May 2009 found Stewart had obtained maximum medical improvement. Physicians expressed differing views on the question whether Stewart's fall on the ice caused her any permanent physical impairment. In September 2009, Dr. Martin Rosenfeld opined Stewart suffered a one percent physical impairment to her shoulder as a consequence of the fall. In 2010, Dr. Thomas Carlstrom opined that Stewart suffered no new physical impairment from her fall.[1] In July 2010, Dr. Jacqueline Stoken opined the fall had exacerbated Stewart's preexisting back condition and caused a right shoulder impairment. Dr. Stoken viewed the low-back impairment as falling within the ten to thirteen percent impairment range and assigned Stewart a thirteen percent impairment of the body as a whole for this injury and ten percent impairment to the body as a whole for the shoulder injury. Dr. Lazaro Rabang opined Stewart's 2009 fall merely temporarily aggravated the back injury sustained in the 2006 Wal-Mart incident.

Stewart filed a complaint against Warren Properties with the workers' compensation commissioner in November 2009 to recover compensation for her February 2, 2009 injury. Following a hearing in October 2010, a deputy commissioner found Stewart sustained a permanent partial unscheduled disability from the injury. The deputy commissioner credited the medical opinion of Dr. Stoken and found Stewart sustained a thirteen percent physical impairment to her body as a whole due to the back injury. The deputy commissioner found no specific percentage of permanent physical impairment to Stewart's

---

[1]In his original evaluation in April 2010, Dr. Carlstrom did not address what impairment was attributable to the 2006 or the 2009 injuries. In October 2010, Dr. Carlstrom supplemented his evaluation and opined that no new impairment resulted from the 2009 injury.

shoulder as a result of the 2009 injury. The deputy commissioner concluded Stewart's disability to her back and shoulder resulted in a fifty percent industrial disability. Stewart was awarded benefits without any apportionment for the preexisting disability that resulted from the 2006 injury. On appeal, the commissioner affirmed the decision of the deputy commissioner.

Warren Properties filed a petition for judicial review with the district court. The district court held the commissioner erred in failing to apportion Stewart's preexisting disability that arose from the 2006 injury when calculating the benefits owed by Warren Properties for the 2009 injury. In doing so, the court held Stewart's compensation for the 2009 injury is limited to the amount of the industrial disability caused by that injury and rejected Warren Properties' contention that apportionment should be effected by crediting the amount previously paid by Wal-Mart to Stewart for the 2006 back injury. The court determined the commissioner was required to award compensation based on the percentage of the worker's disability attributable to the 2009 injury without considering the prior disabilities the employee possessed for which the employer was not responsible. Additionally, the court held that the finding by the commissioner of a thirteen percent impairment resulting from the 2009 injury was too uncertain in light of the evidence that Stewart suffered a thirteen percent impairment to her back from her 2006 injury. The court concluded the commissioner's impairment finding could not be sustained without an additional finding that the prior impairment to the back had healed before the 2009 injury. The district court remanded the case to the commissioner specifically to determine if the 2009 injury resulted in any new back disability.

Stewart and Warren Properties both appealed the decision of the district court. On appeal, Stewart claims the district court erred in concluding that the disability arising from the 2006 and 2009 injuries should be apportioned. She also claims the evidence was sufficient to support the commissioner's finding that the 2009 fall permanently aggravated her preexisting back injury and created a new permanent injury to her shoulder, which combined to sustain a finding of fifty percent industrial disability.

Warren Properties claims on appeal that the district court erred by remanding the case for a new impairment finding because the evidence presented at the hearing does not support any finding of a new disability arising from the 2009 injury. Warren Properties also claims that, if a new impairment rating is warranted, the preexisting disability arising from the 2006 injury must be apportioned through a credit to the employer equal to the forty percent industrial disability paid by Wal-Mart as a consequence of the agreement for settlement.

We conclude the 2004 amendments to the workers' compensation permanent disabilities statute require an evaluation by the commissioner of Stewart's earning capacity both before and after a successive injury sustained in the course and scope of employment with a concurrent employer and that Warren Properties is therefore liable to compensate Stewart for only the reduction in earning capacity caused by the 2009 injury.

## II. Standard of Review.

Judicial review of workers' compensation cases is governed by Iowa Code chapter 17A. *Neal v. Annett Holdings, Inc.*, 814 N.W.2d 512, 518 (Iowa 2012). On our review, we determine whether we arrive at the same conclusion as the district court. *Sherman v. Pella Corp.*, 576 N.W.2d

312, 316 (Iowa 1998). We have determined the legislature has not vested the commissioner with the authority to interpret Iowa Code section 85.34(2)(*u*) and (7)(*a*). *Roberts Dairy v. Billick,* 861 N.W.2d 814, 817 (Iowa 2015). Therefore, we review the commissioner's interpretation "to correct errors of law on the part of the agency." *Teleconnect Co. v. Iowa State Commerce Comm'n*, 404 N.W.2d 158, 161 (Iowa 1987).

We are bound by the agency's findings of fact unless they are not supported by substantial evidence. *Mycogen Seeds v. Sands*, 686 N.W.2d 457, 465 (Iowa 2004). However, we "are not bound by the agency's interpretation [of law] and may substitute our own to correct a misapplication of law." *SZ Enters., LLC v. Iowa Utils. Bd.*, 850 N.W.2d 441, 449 (Iowa 2014); *accord* Iowa Code § 17A.19(10)(*c*) (2009).

### III. History and Background of Successive Disabilities.

Over 100 years have come and gone since our legislature established an administrative agency system to compensate injured workers in this state. *See* 1913 Iowa Acts ch. 147 (codified at Iowa Code §§ 2477-m to 2477-m50 (Supp. 1913)). This system was established for workers in Iowa to avoid litigating claims over work injuries and to provide them with an efficient and speedy resolution and award of compensation. *Shepard v. Carnation Milk Co.*, 220 Iowa 466, 469, 262 N.W. 110, 112 (1935). Over time, the system has become increasingly complex and litigious. *See generally* Joan T.A. Gabel & Nancy R. Mansfield, *Practicing in the Evolving Landscape of Workers' Compensation Law,* 14 Lab. Law. 73 (1998) (discussing the effects that changing common law and new federal laws on disability and family leave have had on workers' compensation practice). At the same time, the courts have continued to play an important role through the process of judicial review. *See* Iowa Code § 17A.19 (2009) (governing judicial review of

administrative actions). This role has led to a century of judicial application of the statutes governing the workers' compensation system, and these statutes have been enforced and supplemented by many court rules and doctrines developed to help carry out the intent and purpose of the statutory framework. *See, e.g., Larson Mfg. Co. v. Thorson*, 763 N.W.2d 842, 851–53 (Iowa 2009) (tracing the development of the cumulative injury rule in Iowa law); *Guyton v. Irving Jensen Co.*, 373 N.W.2d 101, 105 (Iowa 1985) (adopting the "odd-lot doctrine" for disabled employees with no stable job market available).

One fertile area of statutory review by courts over the years has involved the apportionment of compensation for successive injuries. The original statute provided for the apportionment of successive injuries, Iowa Code § 2477-m15(h) (Supp. 1913), and our early cases began the process of applying the statutory doctrine to particular cases. *See, e.g., Pappas v. N. Iowa Brick & Tile Co.*, 201 Iowa 607, 612–13, 206 N.W. 146, 147–48 (1925) (apportioning for initial arm loss when loss of second arm resulted in total disability, but noting a correction by the legislature to cover successive injuries resulting in total disability); *Jennings v. Mason City Sewer Pipe Co.*, 187 Iowa 967, 970–71, 174 N.W. 785, 786 (1919) (apportioning first eye-loss award from the total disability award of an employee who lost his second eye during the course of employment).

Following a decade of early judicial decisions, the legislature amended the successive-injury statute to provide more specifically for the apportionment of compensation for injured employees who had been previously disabled and were drawing compensation at the time of a subsequent injury. *Compare* Iowa Code § 822(*h*) (1919), *with* Iowa Code § 1397(8) (1924) (clarifying the apportionment from the proportion of the incapacity and disability caused by the injury to simply the proportion of

the disability caused by the injury). *See also* Iowa Code § 2477-m9(j)(17) (Supp. 1913) (providing that the loss of any two of certain scheduled members would constitute permanent total disability); Iowa Code § 816(*j*)(19) (1919) (amending the statute to require the double loss occur in a single accident to constitute permanent total disability). Aside from statute renumbering and minor grammatical changes, the statute then remained unchanged from 1924 until 2004. *Compare* Iowa Code § 1397(8) (1924), *with* Iowa Code § 85.36(9)(*c*) (2003).

Over the intervening eighty years, however, we developed a comprehensive body of law to apply this statutory principle of apportionment to a variety of different circumstances. *See Gregory v. Second Injury Fund of Iowa,* 777 N.W.2d 395, 402–03 (Iowa 2010) (Cady, J., dissenting) (discussing the development of the Second Injury Fund for apportionment of scheduled permanent injuries); *Varied Enters., Inc. v. Sumner,* 353 N.W.2d 407, 411 (Iowa 1984) (limiting apportionment to cases in which a prior injury or illness "produces some ascertainable portion of the ultimate industrial disability"), *abrogated on other grounds by P.D.S.I. v. Peterson,* 685 N.W.2d 627, 635 (Iowa 2004); *Ziegler v. U.S. Gypsum Co.,* 252 Iowa 613, 620, 106 N.W.2d 591, 595 (1960) (holding an aggravated injury is compensable to the extent of the injury instead of apportionable). In particular, we adopted the full-responsibility rule and the fresh-start rule. *See Ziegler*, 252 Iowa at 620, 106 N.W.2d at 595 (describing a fresh-start rule that when an employee is hired the employer takes him subject to any active or dormant health impairments); *Rose v. John Deere Ottumwa Works*, 247 Iowa 900, 908, 76 N.W.2d 756, 760–61 (1956) (describing a full-responsibility rule that if a preexisting condition was "aggravated, accelerated, worsened or 'lighted up' " by the injury the employee was entitled to recover). Together, these

two judicial doctrines impacted the apportionment of compensation statute by substantially limiting apportionment in determining the compensation for successive disabilities.

**IV. Statutory Changes to Successive Disabilities and Calculation of Compensation.**

In 2004, the General Assembly amended the 1924 statutory apportionment rule by repealing the old successive disabilities statute and replacing it with a new enactment. *See* 2004 Iowa Acts 1st Extraordinary Sess. ch. 1001, §§ 9–21 (codified in part in scattered sections of Iowa Code chs. 85–86 (2005)). In the Act, the legislature specifically declared its intent in enacting the new statutes, which included the intent to modify our apportionment, fresh-start, and full-responsibility rules. *Id.* § 20. We had not had the opportunity to interpret directly the statutory changes until our recent decision in *Roberts Dairy*.

In *Roberts Dairy*, we examined the scope and meaning of the 2004 statutory approach to apportionment for successive disabilities. 861 N.W.2d at 822. We determined the new statutes took two broad steps. The first step was to provide a new rule to compute compensation for a permanent partial disability in cases involving unscheduled injuries. *Id.* at 822–23; *see* Iowa Code § 85.34(2)(*u*) (2009). Compensation under this rule is computed by considering "the reduction in the employee's earning capacity caused by the disability [as it] relat[es] to the earning capacity that the employee possessed when the injury occurred." Iowa Code § 85.34(2)(*u*).

The second step provided new rules to govern successive disabilities. *Roberts Dairy*, 861 N.W.2d at 823; *see* Iowa Code § 85.34(7). This new statute first articulated two principles applicable to successive

disability cases. The first rule made "[a]n employer . . . liable for compensating all of an employee's disability that arises out of and in the course of the employee's employment with the employer." Iowa Code § 85.34(7)(*a*). The second rule declared that an employer was "not liable for compensating an employee's preexisting disability that arose out of and in the course of employment with a different employer or from causes unrelated to employment." *Id.* Thus, the first statutory principle dealt with successive disabilities with the same employer, and the second statutory principle dealt with successive disabilities with a different employer. *See id.* The remaining portion of the second step provided a special method of compensating successive disabilities incurred with the same employer and further addressed how a merger, purchase, or change in employment affected the same-employer rule. *See id.* § 85.34(7)(*b*)–(*c*). These two new statutory rules for successive disabilities departed from our prior caselaw. For example, our successive disability caselaw evolved without distinguishing between successive disabilities arising from employment with the same or different employers. *See Venegas v. IBP, Inc.*, 638 N.W.2d 699, 701 (Iowa 2002) ("We find no basis for distinguishing between work-related disabilities with the same employer and work-related disabilities with different employers in the application of the full-responsibility rule.").

In *Roberts Dairy,* we held the statutory principle described in section 85.34(7)(*a*)—an employer is not liable for compensating the preexisting disability of an employee from employment with a different employer—did not apply when the earning capacity of the employee had been reevaluated by the competitive labor market. 861 N.W.2d at 823. Thus, we found that the workers' compensation commissioner correctly decided the employer in the case was not entitled to apportion liability for

permanent partial disability benefits paid to an employee based on the losses of earning capacity suffered from two prior injuries while working for different employers because the market had reevaluated earning capacity when the employer hired the employee. *Id.* at 824–25. We found the legislature intended to preserve the fresh-start rule when an employee is reevaluated by the competitive labor market with a change in employment following a permanent partial disability in a prior employment with a different employer. *Id.* at 823.

## V. Liability of Warren Properties for Preexisting Disability.

The issues presented in this case are similar to those presented in *Roberts Dairy*, but arise from different facts. This factual difference does not permit us to rely on *Roberts Dairy* to resolve the issue. The important distinguishing fact is that the preexisting disability at the center of this case did not occur with a previous employer. Instead, it occurred with a concurrent employer. Stewart was working for Warren Properties at the time she sustained the forty percent loss of earning capacity from a permanent partial disability caused by an injury arising out of her employment with Wal-Mart. As a result, Warren Properties argues the apportionment principle under Iowa Code section 85.34(7)(*a*) applies in this case because the reduction in Stewart's earning capacity from the Wal-Mart injury was never adjusted by the competitive labor market. Stewart claims a market adjustment was unnecessary because she maintained her employment with Warren Properties without a diminution in earnings despite her permanent partial disability. She argues the loss of her concurrent job with Wal-Mart without an accompanying loss of her job at Warren Properties gave her a fresh start and served to reestablish her earning capacity. The arguments of the

parties first require us to examine the legislative intent behind the 2004 statutory changes.

Our sole goal in interpreting statutes is to apply the intent of the legislature. *Thomas v. Gavin*, 838 N.W.2d 518, 523 (Iowa 2013). The legislature expressed in detail its intent behind the statutes at issue in this case.[2] Thus, we rely on this intent to guide the application of the statute to the claim for compensation under the facts of this case.

[2]The legislative intent section, 2004 Iowa Acts 1st Extraordinary Sess. ch. 1001, § 20, states:

> It is the intent of the general assembly that this division of this Act will prevent all double recoveries and all double reductions in workers' compensation benefits for permanent partial disability. This division modifies the fresh start and full responsibility rules of law announced by the Iowa supreme court in a series of judicial precedents.
>
> The general assembly recognizes that the amount of compensation a person receives for disability is directly related to the person's earnings at the time of injury. The competitive labor market determines the value of a person's earning capacity through a strong correlation with the level of earnings a person can achieve in the competitive labor market. The market reevaluates a person as a working unit each time the person competes in the competitive labor market, causing a fresh start with each change of employment. The market's determination effectively apportions any disability through a reduced level of earnings. The market does not reevaluate an employee's earning capacity while the employee remains employed by the same employer.
>
> The general assembly intends that an employer shall fully compensate all of an injured employee's disability that is caused by work-related injuries with the employer without compensating the same disability more than once. This division of this Act creates a formula that applies disability payments made toward satisfaction of the combined disability that the employer is liable for compensating, while taking into account the impact of the employee's earnings on the amount of compensation to be ultimately paid for the disability.
>
> The general assembly does not intend this division of this Act to change the character of any disability from scheduled to unscheduled or vice versa or to combine disabilities that are not otherwise combined under law existing on the effective date of this section of this division of this Act. Combination of successive scheduled disabilities in section 85.34, subsection 7, as enacted in this division of this Act, is limited to disabilities affecting the same member, such as successive disabilities to the right arm. A disability to the left arm that is followed by a disability to the right arm is governed by section 85.64 and is not a successive

The starting point for the resolution of the apportionment issue presented by the arguments of the parties is the statutory principle expressed in the second sentence of section 85.34(7)(*a*). This statutory rule of apportionment is applicable to the "preexisting disability that arose out of and in the course of employment with a different employer." Iowa Code § 85.34(7)(*a*). The legislative intent behind this rule was to "prevent all double recoveries and all double reductions in workers' compensation benefits for permanent partial disability." 2004 Iowa Acts 1st Extraordinary Sess. ch. 1001, § 20. The statute does not specifically mention concurrent employers, but concurrent employers are also different employers.[3] The text of the statute clearly captures concurrent employers. Thus, Stewart was not beyond the scope of the governing rule simply because her preexisting disability with a "different employer" was sustained at the time she also maintained employment with Warren Properties. We are required to use the plain language of the statute when construing statutes. *Neal*, 814 N.W.2d at 519.

---

disability under this division. This division does not alter benefits under the second injury fund, benefits for permanent total disability under section 85.34, subsection 3, the method of determining the degree of unscheduled permanent partial disability, the compensable character of aggravation injuries, or an employer's right to choose the care an injured employee receives, expand the fresh start rule to scheduled disabilities, or change existing law in any way that is not expressly provided in this division.

The general assembly intends that changes in the identity of the employer that do not require the employee to reenter the competitive labor market will be treated as if the employee remained employed by the same employer.

[3]The statute also excepts injuries unrelated to employment from the employer's liability. Iowa Code § 85.34(7)(*a*). The legislature clearly wished to limit an employer's liability to only disabilities "aris[ing] out of and in the course of the employee's employment with the employer" and no others. *Id.*

The concern expressed by the legislature over double recoveries and double reductions for successive permanent partial disabilities can be traced to the role of a preexisting disability in the payment of compensation for a subsequent injury. *See, e.g., Ziegler*, 252 Iowa at 619–20, 106 N.W.2d at 594–95 (evaluating subrogation rights of employer to employee's settlement with third-party tortfeasor of original injury in an injury-aggravation case). When a successive injury increases a preexisting permanent disability to the body as a whole, the benefits provided for the successive injury must not include a double recovery for the first disability or a double reduction for the first disability. *See* 2004 Iowa Acts 1st Extraordinary Sess. ch. 1001, § 20.

The legislature intended to address this issue by enacting Iowa Code section 85.34(7)(*a*). Importantly, it did not just express an intent to apportion preexisting disabilities from different employers to prevent double recoveries. Iowa Code § 85.34(7)(*a*). It also expressed its intent to prevent double reductions by adopting the fresh-start rule we had developed in our prior cases. *See id.*; 2004 Iowa Acts 1st Extraordinary Sess. ch. 1001, § 20. While the legislature sought to relieve employers of any "liab[ility] for compensating an employee's preexisting disability" that arose in employment with a different employer or outside of employment, it expressed its clear intent to adopt a modification of the fresh-start rule to recognize the reevaluation of earning capacity achieved through the "competitive labor market . . . with each change of employment." Iowa Code § 85.34(7)(*a*) (first quote); 2004 Iowa Acts 1st Extraordinary Sess. ch. 1001, § 20 (second quote). The legislature accepted the general premise that the competitive labor market reestablishes a worker's earning capacity following a disabling injury and further observed that this market "effectively apportions any disability through a reduced level

of earnings." 2004 Iowa Acts 1st Extraordinary Sess. ch. 1001, § 20. Thus, the legislative intent reveals the modified fresh-start rule does not run afoul of the statutory principle that employers must not be liable for compensating an employee's preexisting disability with a different employer. *Id.*; *see* Iowa Code § 85.34(7)(*a*). No double recovery occurs because the preexisting disability has been integrated into a new working unit, with a new earning capacity recognized by the competitive labor market. 2004 Iowa Acts 1st Extraordinary Sess. ch. 1001, § 20. The fresh-start rule does not make an employer liable for compensating an employee's preexisting disability with a different employer because apportionment effectively took place prior to the second injury through the forces of the competitive labor market associated with a change in employment. *See id.*

This proposition established the basis of our holding in *Roberts Dairy*, 861 N.W.2d at 823. In that case, the worker had changed employment after sustaining permanent partial disabilities, and his earning capacity was effectively reset by the competitive labor market that accompanied each change of employment, including his employment at the time of his injury. *Id.* at 816, 823–24. We applied the modified fresh-start rationale adopted by the legislature in enacting Iowa Code section 85.34(7)(*a*). *Id.* at 823.

The legislature, however, did not preserve the fresh-start rule beyond the competitive-job-market rationale. Additionally, it specifically found "[t]he market does not reevaluate an employee's earning capacity while the employee remains employed by the same employer." 2004 Iowa Acts 1st Extraordinary Sess. ch. 1001, § 20. Thus, to ensure employers are not liable for compensating preexisting disabilities incurred at a different employer or outside employment, the rule does not apply when

earning capacity has not been reset by the competitive labor market after the prior permanent partial disability was established. When earning capacity has not been reevaluated by the market, Iowa Code section 85.34(7)(*a*) must be observed in determining the compensation paid for successive disabilities.

We recognize the legislature did not establish a specific method of apportionment for successive disabilities with different employers when no market reevaluation has taken place, as it did for successive disabilities with the same employer. *See* Iowa Code § 85.34(7)(*b*). In *Roberts Dairy*, we used this observation as a secondary rationale to support our conclusion that the legislature did not intend to apportion liability for successive disabilities between different employers when a competitive labor market reevaluation has occurred. 861 N.W.2d at 823. While the maxim *expressio unius est exclusio alterius* tells us to infer all omissions are intentional exclusions when "a statute designates a form of conduct, the manner of its performance and operation," and to what it refers. 2A Norman J. Singer & Shambie Singer, *Statutes and Statutory Construction* § 47:23, at 406–13 (7th ed. 2014) (footnotes omitted). It does not apply without evidence the legislature specifically intended for all other options to be excluded. *Id.* § 47:25, at 446; *see also Andover Volunteer Fire Dep't v. Grinnell Mut. Reins. Co.*, 787 N.W.2d 75, 86 (Iowa 2010) (considering the history and purpose of the statute as well as ordinary meaning of a term and its context when construing the meaning of a statute). Considering the legislature's intent to avoid double recoveries and double reductions, we find that, although a specific method of apportionment was not established, the legislature did not intend to exclude from apportionment successive disabilities with different employers when no market reevaluation has occurred. The

compensation formula provided by the legislature in section 85.34(2)(*u*), used for all successive disabilities with separate employers, can be used in conjunction with the rule in section 85.34(7)(*a*) to apportion the loss in earning capacity when a market reevaluation has not occurred.

In this case, the fresh-start rule recognized by the legislature does not apply to refresh Stewart's earning capacity lost due to the permanent partial disability arising from her 2006 injury sustained while working for Wal-Mart. She never competed in the labor market after the Wal-Mart injury. This is the critical distinction separating this case from *Roberts Dairy*. Thus, Stewart is not entitled to compensation from Warren Properties under section 85.34(2)(*u*) for the forty percent loss of earning capacity resulting from the 2006 Wal-Mart injury.

Notwithstanding, we acknowledge that the absence of a competitive-job-market readjustment of an injured worker's earning capacity does not mean their postinjury industrial disability will always remain constant. *See* 7 Arthur Larson & Lex K. Larson, *Larson's Worker's Compensation Law* § 81.03[1], at 81-13 (2014) [hereinafter Larson] (actual earnings only "create a presumption which may be overcome by other evidence showing that the actual earnings do not fairly reflect claimant's capacity"). The absence of a market readjustment merely means an injured worker does not receive the benefit of an automatically refreshed earning capacity in computing benefits for the successive disability. A change in earning capacity can be shown by evidence other than new employment, including changes in the employee's functional capacity, education, qualifications, experience, and training. *See Oscar Mayer Foods Corp. v. Tasler*, 483 N.W.2d 824, 831 (Iowa 1992); *see also* 7 Larson, §§ 81.05–.06, at 81-19 to 81-21 (citing factors like actual pre- and post-injury wages, increased training, and

education as things to be considered when calculating earning capacity). Nevertheless, no such evidence was presented in this case to show Stewart's reduced earning capacity resulting from her 2006 Wal-Mart injury had been restored in whole or in part as a consequence of unexpected healing, a change in her qualifications, training, education, or other factors prior to the 2009 Warren Properties injury. The argument by Stewart that her continued employment with Warren Properties following her permanent partial disability while at Wal-Mart served to produce a fresh start and effectively apportioned her preexisting disability is inconsistent with the legislative intent behind the statutory changes. 2004 Iowa Acts 1st Extraordinary Sess. ch. 1001, § 20. The legislature made it clear that the fresh-start rule is now based on the reevaluation of earning capacity occurring in the competitive labor market with a change of employment. *Id.* Stewart's earning capacity underwent no reevaluation during her continuing employment with Warren Properties.[4] Additionally, earning capacity is not necessarily coextensive with actual earnings. *See* 7 Larson, § 81.01, at 81-2 to 81-5 (indicating actual earnings are not the same as earning capacity); *see also Clark v. Vicorp Rests., Inc.,* 696 N.W.2d 596, 605 (Iowa 2005) (finding a reduction in actual earnings is not necessary to show reduced earning capacity).

Accordingly, the compensation in this case must be computed under the formula set out in section 85.34(2)(*u*), and the apportionment rule in section 85.34(7)(*a*) must be applied to assure that any compensation paid by Warren Properties for the 2009 injury is based on

---

[4]There is no evidence in this case that Stewart competed for a job within her employment with Warren Properties following the initial injury.

the loss of earning capacity resulting from that injury and not the forty percent loss of earning capacity sustained by Stewart as a consequence of the 2006 injury.

## VI. Statutory Calculation of Successive Disabilities.

Under the compensation formula for unscheduled injuries in section 85.34(2)(*u*) as amended, employees who suffer successive permanent partial disabilities are paid benefits based on their weekly earnings for a number of weeks determined by the application of two factors.[5]  Iowa Code § 85.34(2)(*u*).  One factor is the earning capacity possessed when the successive injury occurred, and the other factor is the reduction in earning capacity, or disability, caused by the successive injury.  *Id.*  The compensation paid for a successive injury equals "the reduction in the employee's earning capacity caused by the disability . . . in relation to the earning capacity" possessed at the time of the injury relative to 500 weeks.  *Id.*  When successive disabilities are involved, this formula must be applied in a way that will not make the successive employer liable for a preexisting disability arising from an injury sustained by the employee while working for another employer.  *See id.* § 85.34(7)(*a*).  To accomplish this statutory requirement, the preexisting disability must be apportioned from the formula when it has not been effectively apportioned by the competitive labor market through a fresh start with a new employer.  In other words, without a market adjustment through a change in employment, any preexisting disability must be

---

[5]Compensation for scheduled injuries specifically listed in the statute is based on a different statutory scheme assigning a number of weeks of compensation for different scheduled members.  Iowa Code § 85.34(2)(*a*)–(*t*).  The Second Injury Compensation Act governs compensation for certain successive injuries to multiple scheduled members.  *See id.* §§ 85.63–.69.

apportioned so that only the new disability resulting from a successive injury is determined based on the two factors considered in the formula. *See* 2004 Iowa Acts 1st Extraordinary Sess. ch. 1001, § 20. The earning capacity possessed at the time of the successive injury does not include any earning capacity lost as a consequence of a prior work-related injury or due to causes unrelated to employment, and the reduction in earning capacity caused by the successive injury therefore cannot include any earning capacity that was lost and not regained before the successive injury at issue in a particular case.[6] *See id.*

---

[6]The application of the compensation formula for unscheduled injuries in cases of successive permanent partial disabilities arising from different employers with no market reevaluation or other change in earning capacity following the first disability can be illustrated with the following example by using percentages consistent with evidence of functional impairments and loss of earning capacity common to workers' compensation hearings. A worker injures his back on the job and suffers a ten percent permanent impairment of his body as a whole and a forty percent loss of earning capacity. Compensation is paid under section 85.34(2)(*u*) for 200 weeks. The reduction in earning capacity caused by the disability was forty percent, and the earning capacity possessed when the injury occurred was 100%. Forty percent of 500 weeks equals 200 weeks. Two years later, while working for a different employer and—as in this case— without any labor market reevaluation in earning capacity, the same worker is again injured on the job. As a result of the new injury, the worker now has a thirteen percent permanent impairment to the body as a whole and a fifty percent loss of earning capacity.

Compensation is paid under section 85.34(2)(*u*) "during the number of weeks in relation to five hundred weeks as the reduction in the employee's earning capacity caused by the disability bears in relation to the earning capacity that the employee possessed when the injury occurred." Iowa Code § 85.34(2)(*u*). We have recognized the phrase "in relation to" to require a division computation between the compared numbers in other contexts. *See In re Marriage of Benson*, 545 N.W.2d 252, 255 (Iowa 1996) (calculating divorcing spouse's share of pension benefits). In a mathematical formulation, the reduction in earning capacity divided by earning capacity possessed is equal to the number of weeks compensated divided by 500 weeks. Applying this formula to our hypothetical scenario, the reduction in earning capacity caused by the successive injury was ten percent (fifty percent minus forty percent) and the earning capacity possessed when the injury occurred was sixty percent (100% minus forty percent). To determine the compensable change in earning capacity, we divide the reduction in earning capacity, ten percent, by the earning capacity possessed when the successive injury occurred, sixty percent. In this example, that calculation equals 16.67%, and 16.67% of 500 weeks equals 83.3 weeks.

In this case, the commissioner applied the formula without apportioning the prior loss of earning capacity attributable to the prior injury while working at Wal-Mart. This constituted legal error because Stewart's earning capacity was not refreshed in the competitive labor market prior to the 2009 injury. Accordingly, the commissioner must recompute the benefits payable to Stewart under the evidence in this case. *See Swiss Colony, Inc. v. Deutmeyer*, 789 N.W.2d 129, 136 (Iowa 2010) (remanding "for a recalculation of benefits under the proper standard").

### VII.  Evidence to Support Successive Disabilities.

Warren Properties claims it is unnecessary to remand the case to the commissioner to recompute benefits under the compensation formula because the evidence in this case did not support a finding of a new disability arising from the February 2, 2009 injury. It argues the only logical conclusion that can be drawn from the evidence in this case is the unscheduled injury in 2009 did not increase Stewart's functional impairment that arose from the 2006 injury and could not have increased her industrial disability beyond the forty percent loss compensated by Wal-Mart under the agreement for settlement of the 2006 injury. *See Frost v. S.S. Kresge Co.*, 299 N.W.2d 646, 648 (Iowa 1980) (reversing the commissioner due to disagreement on a legal conclusion concerning the facts of the case). Warren Properties asserts Stewart suffered no new disability to her back because her permanent physical impairment of thirteen percent after the 2006 injury was not increased by the 2009 injury.

Permanent partial disability results from the loss, or functional impairment, of an unscheduled part of the body, such as the back, shoulder, neck, or hip. *See* Iowa Code § 85.34(2)(*u*). The original

impairment is permanent and cannot form the sole basis for a second permanent partial disability claim for benefits. *See Yeager v. Firestone Tire & Rubber Co.*, 253 Iowa 369, 374–75, 112 N.W.2d 299, 302 (1961) ("If his condition was aggravated . . . so it resulted in the disability found to exist, plaintiff was entitled to recover therefor. Of course he was not entitled to compensation for the results of a pre-existing injury or disease."). A new or additional permanent impairment must be established for an impairment to be the sole basis of a new award. *See Excel Corp. v. Smithart*, 654 N.W.2d 891, 898 (Iowa 2002) (distinguishing between separate injuries and cumulative injuries for purposes of compensation), *superseded by statute*, 2004 Iowa Acts 1st Extraordinary Sess. ch. 1001, § 12, *as stated in Roberts Dairy*, 861 N.W.2d at 819 n.1; *cf. Blacksmith v. All-Am., Inc.*, 290 N.W.2d 348, 350 (Iowa 1980) (holding a subsequent change in earning capacity proximately caused by the original injury, even without a change in physical condition, may constitute a compensable change in industrial disability).

An award of compensation for a successive unscheduled permanent partial disability requires a finding of a loss of earning capacity caused by the successive injury. As we have already noted, one of the factors in determining the extent of an unscheduled disability is permanent physical impairment. In this case, the record includes medical evidence tending to prove the permanent functional impairment resulting from the 2006 back injury could have been as low as ten percent or as high as thirteen percent. The commissioner found Stewart suffered a thirteen percent functional impairment following the 2009 injury, with no finding made regarding the 2006 impairment. There is evidence in the record tending to prove Stewart's 2009 injury was not confined to the back and resulted in permanent partial functional

impairment to the shoulder. Accordingly, there is substantial evidence in the record supporting the commissioner's finding that the 2009 injury caused some increase in Stewart's permanent physical impairment affecting the determination of Stewart's industrial disability in this case. We therefore reject Warren Properties' contention that the evidence pertaining to Stewart's loss of functional capacity arising from the 2006 injury precludes a finding that Stewart suffered an industrial disability as a consequence of the 2009 injury. Notwithstanding, the commissioner must show the process as now required under section 85.34(2)(*u*) to reach his decision. *See Bridgestone/Firestone v. Accordino*, 561 N.W.2d 60, 62 (Iowa 1997) (indicating the commissioner must detail the process used to reach conclusions to permit adequate judicial review). The formula requires the commissioner to determine the earning capacity when the successive injury occurred and the reduction in earning capacity caused by the disabilities.

### VIII. Conclusion.

We conclude the commissioner erred in interpreting section 85.34(7)(*a*) and applying the compensation formula under section 85.34(2)(*u*). We affirm in part and reverse in part the decision of the district court and remand the case to the district court to remand the case back to the commissioner for further proceedings consistent with this decision. *See Staff Mgmt. v. Jimenez*, 839 N.W.2d 640, 658 (Iowa 2013). We tax the costs of this action equally between the parties.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH DIRECTIONS.**